```
United States of America,    )
                             )
              Plaintiff,     )
                             )
         v.                  )
                             )    No. CR—09-0527 DLJ
Vincent Hunter,              )
                             )    ORDER
              Defendant.     )
_____)
```

On May 20, 2009 the United States filed a one count indictment against Vincent Hunter (Hunter) charging him with violating 18 U.S.C. § 922(g)(1), being a felon in possession of a firearm. On October 30, 2009 defendant Hunter filed a motion to suppress the gun recovered by the police. On December 3, 2009 the government filed a superseding indictment adding a second count of violation of 21 USC § 844(a), possession of cocaine base. Defendant amended his motion to suppress to also include the drugs which had been seized.

On January 7, 2010 this Court held an evidentiary hearing on the motion. Attorney Joshua Hill appeared on behalf of the United States and defendant was represented by Attorney Geri Green. At the conclusion of the hearing, as the trial in this matter was imminent, the Court ruled from the bench, explaining its reasoning and denying the motion to suppress. In order for the record to be complete, the Court's full reasoning is set out below.

**I. BACKGROUND**

    A.   <u>Evidentiary Hearing</u>

Trial in this matter was set for January 11, 2010. An

evidentiary hearing on defendant's motion to suppress was held on January 7, 2010. The government called OPD officer Joe Fesmire (Fesmire) as a witness at the evidentiary hearing, and introduced photos, maps, and a tape of the police radio traffic related to the incident.

That evidence supports findings of the Court that on March 17, 2009, at about 3:45 a.m., OPD Officers Mario Castro (Castro) and his partner, Officer Frank Lopez began a pursuit of a stolen car on Walnut Street in East Oakland. OPD Officer Fesmire was on duty nearby in a marked patrol vehicle and heard the radio report that officers were in pursuit of a stolen car. By the time Fesmire arrived on the scene, the chase had terminated at a dead end in an apartment complex at 1256 99th Avenue. See Fesmire Decl. Ex. 2.

Officer Castro observed the driver exit the car and run towards 99th Avenue Court. The driver, later identified as Tyree Foster was arrested at the scene.

Officer Castro also saw a second person leave the passenger side of the car and take flight. Castro chased that suspect and radioed in his description of the suspect and the direction in which he was headed. Castro saw the passenger climb a fence and run towards the area of Manual Court and A Street.

The description given by Castro was: "male Black, black hoodie, black jeans." After hearing that the suspect was last seen headed towards the direction of Manuel Court and A Street, Fesmire drove to that area and arrived at the intersection of

2

1   100th Avenue and A Street, which is less than 100 yards from
2   the intersection of Manuel Court and A Street.
3       Fesmire saw a person (later identified as Hunter) walking
4   on A Street near Manual Court towards 100th Avenue.  Fesmire
5   believed that this individual matched the description of the
6   passenger of the stolen car.  There were no other people on the
7   street.
8       Fesmire testified that when Hunter saw his police uniform
9   and marked police car, he immediately ran down 100th Avenue
10  towards B Street. Fesmire followed in his vehicle. At B Street,
11  Hunter climbed a fence and ran through the back yard of 9946 B
12  Street, a residence on the corner of B Street and 100th Avenue.
13  Fesmire drove around the corner to the front of the house, and
14  at this point, saw Hunter running towards him in the direction
15  of the front door of the house.  Fesmire saw Hunter pause at a
16  bush in front of the house and move his body towards the bush
17  in a fashion that led Fesmire to believe that he was discarding
18  illegal contraband, such as a gun or narcotics.  This area of
19  Oakland was known to be a high crime neighborhood.
20      Fesmire stated that, fearing for his personal safety, he
21  pointed his weapon at Hunter and ordered him to raise his
22  hands. Fesmire stated that he took these actions because: (1)
23  Hunter matched the description of the suspect who had fled from
24  the stolen vehicle; (2) Hunter fled at the sight of him and
25  discarded potentially illegal contraband in a bush; (3) there
26  was very little light in the area at the time; and (4) the area
27  around 100th Avenue and B Street was known to be a dangerous
28

place.

Hunter refused to comply with Fesmire's orders and instead beat on the front door of 9946 B Street, shouting to be let in. Fesmire again ordered Hunter to get his hands up and to get on the ground and Hunter now complied. At this point another officer placed Hunter in handcuffs. When Fesmire helped Hunter to his feet, another officer recovered a small "twistie" of suspected cocaine base from the ground where Hunter had been laying. Fesmire then put Hunter in the back seat of his patrol vehicle while he returned to the bush where he had seen Hunter make a furtive movement. Fesmire then searched the bush in front of the house and recovered a firearm loaded with four rounds of live ammunition.

Fesmire ran a records check and learned that Hunter was a convicted felon on state probation. Hunter was arrested for violating Penal Code § 148(a) (resisting or obstructing arrest); Penal Code § 1203.2(a) (probation violation); Penal Code § 12021(a) (felon in possession of a firearm); Health & Safety Code § 11350(a) (possession of a controlled substance); and Health & Safety Code § 11370.1 (possession of controlled substance while armed).

Fesmire further stated that after he had taken Hunter from the scene in his patrol car, and after Hunter was removed from the car, he found a second "twistie" of suspected cocaine base in the area where Hunter had been. When Hunter was arrested he was found to be wearing dark blue rather than black pants. No further evidence was offered at the evidentiary hearing.

4

## II. Legal standard

### A. Standing

A defendant who voluntarily abandons property has no standing to contest its search and seizure. United States v. Garcia, 909 F.2d 389, 391 (9th Cir.1990). Abandonment, however, must be voluntary, and an abandonment that results from a Fourth Amendment violation cannot be voluntary. United States v. Stephens, 206 F.3d 914, 917 (9th Cir. 2000).

### B. Lawful Arrest

If an officer has a reasonable and articulable suspicion that criminal activity is afoot he make stop an individual. This is known as a Terry stop. Terry v. Ohio, 392 U.S. 1, 30-31 (1968). Although an officer must have an "objective justification for making the stop," reasonable suspicion "is a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence." Illinois v. Wardlow, 528 U.S. 119, 123 (2000).

To evaluate the presence of reasonable suspicion, courts consider many factors. In Illinois v. Wardlow, the Supreme Court held that "unprovoked flight upon noticing the police . . . is a pertinent factor in determining reasonable suspicion." Id. at 124.

The Fourth Amendment protects individuals from "unreasonable searches and seizures." U.S. Const. Amend. IV. According to the Supreme Court, there are three types of police-citizen encounters: (1) consensual encounters which do not implicate the Fourth Amendment, see e.g. Michigan v.

5

1    Chesternut, 486 U.S. 567, 574-76 (1988); INS v. Delgado, 466
2    U.S. 210, 218-219 (1984); (2) investigative detentions which
3    are Fourth Amendment seizures of limited scope and duration and
4    must be supported by a reasonable suspicion of criminal
5    activity, see e.g., United States v. Sokolow, 490 U.S. 1 , 7
6    (1989);1, 392 U.S. 1, 30 (1968); and (3) arrests, the most
7    intrusive of Fourth Amendment seizures and reasonable only if
8    supported by probable cause. See e.g, Hayes v. Florida, 470
9    U.S. 811, 815-16 (1985); Dunaway v. New York, 442 U.S. 200,
10   212-16 (1979).
11       A consensual encounter "may evolve into a situation where
12   the individual's ability to leave dissipates." United States
13   v. Ayarza, 874 F.2d 647, 650 (9th Cir. 1989)
14   III. **Discussion**
15       A. Does Hunter Have Standing to Assert the Motion?
16       The government's threshold argument is that Hunter lacks
17   standing to challenge the seizure of the gun because he
18   abandoned it by discarding it in a bush. As noted above, the
19   Court must determine: (a) did the defendant abandon the
20   property; and (b) was the abandonment part of a search which
21   would violate the Fourth Amendment.  The government argues that
22   the police had reasonable suspicion to detain Hunter for
23   purposes of an investigation, and therefore Fesmire's actions
24   were lawful.
25       Defendant argues that the detention of Hunter was not a
26   legal Terry stop and also that the case relied on the
27   government to support their abandonment claim, California v.
28
                                    6

Hodari D, 499 US 621, 629 (1991), is inapposite. The facts of the Hodari case are, in fact, quite similar to this case.

In Hodari, a group of youths, including respondent Hodari D., fled at the approach of an unmarked police car on an Oakland street. Officer Pertoso, who was wearing a jacket with "Police" embossed on its front, left the car to give chase. Pertoso did not follow Hodari directly, but took a circuitous route that brought the two face to face on a parallel street. Hodari, however, was looking behind as he ran and did not turn to see Pertoso until the officer was almost upon him, whereupon Hodari tossed away a small rock. Pertoso tackled him, and the police recovered the rock, which proved to be crack cocaine.

In the juvenile proceeding against Hodari, the court denied his motion to suppress the evidence relating to the cocaine. The State Court of Appeal reversed, holding that Hodari had been "seized" when he saw Pertoso running towards him; that this seizure was "unreasonable" under the Fourth Amendment, the State having conceded that Pertoso did not have the "reasonable suspicion" required to justify stopping Hodari; and therefore that the evidence of cocaine had to be suppressed as the fruit of the illegal seizure.

The U.S. Supreme Court granted certiorari. It determined that the only issue presented to the Court was whether, at the time Hodari dropped the drugs, had he been "seized" within the meaning of the Fourth Amendment. The Court held that the word "seizure" doe not "remotely apply, however, to the prospect of a policeman yelling 'Stop, in the name of the law!' at a

7

fleeing form that continues to flee." Id.

Relying on its reasoning in Brower v. Inyo County, 489 U.S. 593, 596 (1989), the Court determined that, since Hodari did not comply with the injunction to stop, he was not seized until he was tackled and as a result the cocaine abandoned while he was running was not the fruit of a seizure.

The facts here are similar. Hunter saw the police and he ran. Before he stopped running he discarded an item in a bush. Under the reasoning of Hodari, the gun would not be the fruit of an illegal seizure as Hunter was not seized until after he had discarded the gun.

However, the Court must still determine whether the seizure of Hunter was reasonable. As discussed below, the Court finds that it was.

B. Was Hunter's detention appropriate?

The government argues that Fesmire conducted a valid Terry stop. In Illinois v. Wardlow, 528 U.S. 119, 123 (2000) police officers were patrolling an area known for illegal drug activity. The suspect Wardlow fled upon seeing that police were present. The officers eventually cornered him, conducted a pat down search, and discovered a handgun. Id. at 121-22. The Court stated that a combination of factors created reasonable suspicion for the Terry stop: the suspect's presence in a heavy crime area, his "nervous, evasive" behavior, and his "[h]eadlong flight." Id. at 124. The Court focused on the flight, saying headlong flight was "not necessarily indicative of wrongdoing, but it is certainly suggestive of such." Id. See

8

also, United States v. Cervantes-Flores, 421 F.3d 825, 829-30 (9th Cir. 2005); United States v. Chamberlin, 644 F.2d 1262, 1265 (9th Cir. 1980) cert. denied, 453 U.S. 914 (1981).

The government asserts that as in Wardlow above, the circumstances surrounding the stop of Hunter gave rise to reasonable suspicion. The police were in pursuit of a passenger from a stolen car. Hunter was in the location where they believed the passenger had fled and Hunter's appearance, while his pants were dark blue rather than black, matched the description of the suspect.

More relevant, however, was that according to the police, when Hunter saw Fesmire, he fled immediately over a fence, and ultimately ran towards the front door of 9946 B Street. While near the front door, Hunter made a move towards a bush at that location, and based on Fesmire's observation, it appeared to him that Hunter was discarding a gun or drugs.  Fesmire aimed his gun at Hunter, and Hunter was placed in handcuffs. Additionally, all of this took place in a high crime area in Oakland. The government claims that the combination of these factors created a reasonable and articulable suspicion that criminal activity was afoot and that therefore  Fesmire was entitled to detain Hunter for investigatory purposes under Terry and its progeny.

Defendant argues that the facts cannot support a Terry stop because the police "spotted a black man and tackled him" without time for Hunter to have engaged in any evasive or suspicious activity.  Citing Washington v. Lambert, 98 F.3d

1181, 1190 (9th Cir. Cal 1996) the defendant argues that the description of the fleeing suspect was so vague as to cover any number of African American males. While this circumstance may be true, there are additional circumstances in this case. The incident took place at 3:45 in the morning when the streets were deserted; defendant's clothing was, if not exactly matching the description, essentially similar (black hoodie, black pants, vs black hoodie, dark blue jeans); Hunter was where the police would have expected the fleeing suspect to be; and Hunter did, in fact, by his sudden flight, engage in evasive, suspicious activity. The Court finds that all of these factors combine to make the stop reasonable.

Even if the police suspicion that Hunter was their fleeing suspect is arguably unreasonable, the police had an independently valid reason for stopping him. Namely that Hunter fled immediately upon sight of the police. Having heard both the police tape and having the benefit of the police officer testimony on this issue at the evidentiary hearing, the Court finds that testimony credible.

Defendant's motion is further premised on the idea that defendant was unlawfully arrested. The government counters that Fesmire's <u>Terry</u> stop did not become a full-blown arrest until the OPD Officers discovered Hunter's possession of narcotics and a firearm, along with Hunter's probationary status.

To determine whether an investigatory stop has ripened into an arrest, a court must consider the "totality of the

10

circumstances." United States v. Rousseau, 257 F.3d 925, 929 (9th Cir. 2001) (citing United States v. Del Vizo, 918 F.2d 821, 824 (9th Cir. 1990)). Consideration of the "totality of the circumstances" requires evaluating the intrusiveness of the stop (e.g., the aggressiveness of the methods used by police and the degree of restriction to the subject's liberty), and the justification for using such tactics (e.g., whether the officer had sufficient fear for his/her safety to warrant more intrusive action.). Rousseau, 257 F.3d at 929.

The government argues that the use of physical force to restrain the suspect was warranted by the threat of flight by defendant and did not turn the Terry stop into an arrest. Washington v. Lambert, 98 F.3d 1181, 1189 (9th Cir.1996) (danger or flight).  According to police, Hunter fled from Fesmire and refused to respond to Fesmire's request "to get his hands up." Instead, Hunter beat on the front door of 9946 B Street and "behaved in a generally belligerent manner." Eventually, Hunter complied with commands for him to get on the ground, and another officer placed Hunter in handcuffs.

The government argues that Fesmire was entitled to use reasonable methods to protect himself and others in a potentially dangerous situation and that Fesmire's actions were necessary to ensure that he and his colleagues could perform an adequate investigation without risking harm. Finally, the government argues that probable cause existed for the eventual arrest of Hunter.  Hunter was arrested for violating five California statutes: including an uncontested probation

11

violation and also the current charges of possessing narcotics and a firearm. The Court finds the government's arguments persuasive and supported by the evidence presented at the evidentiary hearing.

IV. Conclusion

Based on its finding that the police officer had reasonable suspicion to detain defendant the Court holds that there is no constitutional basis for suppressing the gun or the drugs and Hunter's Motion to Suppress is DENIED.

IT IS SO ORDERED.

Dated: February 11, 2010

D. Lowell Jensen
United States District Judge